Bennet F. SCHAUFFLER, Regional Director of the Fourth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 30, UNITED SLATE, TILE AND COMPOSITION ROOFERS, DAMP AND WATERPROOF WORKERS' ASSOCIATION, AFL–CIO, Respondent.

Civ. A. No. 2286.

United States District Court
D. Delaware.

Feb. 10, 1961.

George J. Brannick and Lawrence J. Hinkle, Attys., N. L. R. B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Winthrop A. Johns, Asst. Gen. Counsel, Julius G. Serot, Deputy Asst. Gen. Counsel, Washington, D. C., and Leonard Leventhal, Regional Atty., Fourth Region, Philadelphia, Pa., on brief), for petitioner.

Richard H. Markowitz, Philadelphia, Pa., for respondent.

CALEB M. WRIGHT, Chief Judge.

This proceeding is before the court on a petition filed by the Regional Director of the Fourth Region of the National Labor Relations Board pursuant to Section 10($l$) of the National Labor Relations Act, as amended.[1] The petition alleges that Local 30 has violated Section 8(b) (4) (i) (ii) (B) of the Act[2] and seeks a temporary injunction pending final determination by the Board. The charge upon which petitioner is acting was filed by Lance Roofing Company, Inc. (Lance).[3]

Taking the testimony in the light most favorable to petitioner, it appears that the Henry C. Beck Construction Company (Beck) has been engaged as the general

---

1. 29 U.S.C.A. § 160($l$).

2. 29 U.S.C.A. § 158(b) (4) (i) (ii) (B).

3. The parties have stipulated that there is sufficient interstate commerce and that Local 30 is a labor organization within the meaning of the Act and is engaged in its normal business within this judicial district.

contractor in the construction of a factory for the Globe Battery Company at Middletown, Delaware. Beck subcontracted the roofing work on this job to Lance, which began its services on or about November 18, 1960. Lance, which has its principal place of business in Atlanta, Georgia, rented a building in Middletown, approximately one mile from the Globe job site. This building was used only as a meeting place for Lance's nine employees in Delaware, from which they were transported to the job site each morning. Lance kept no books, records, materials, or equipment there, with the exception of a pickup truck which remained there at night. No other business was carried on in the building, although handwritten, cardboard signs were placed in certain windows identifying the building as an office of the Lance Roofing Co.

Early in December, Lance's supervisor was approached by Local 30's business agent who stated that Lance's employees, although members of the same international union, had not been cleared by Local 30. Negotiations were thereupon undertaken, and the initial sessions were held in the office of one Cox, Beck's supervisor on the Globe job. This office was about 14' by 20' in size and was the only place available for such discussions on the job site. In the course of one of these early sessions, Local 30's business agent told Lance's representative that the situation would have to be straightened out or else the job would be tied up. Cox was present and heard this remark. Soon after, the negotiations moved to Philadelphia.

Later in December, Cox called an officer of the Building Trades Council to discover whether there would be a work stoppage on the Globe job. He had ordered 45 yards of concrete to be poured on a particular day and was anxious to hold up delivery if there was to be a stoppage. Although the outcome of his conversation is not in evidence, Cox told Lance to keep its employees off the job site while the concrete was being poured. Cox testified that the telephone call and request to Lance were not the results of threats.

He said this action was taken solely out of an excess of caution and because he had heard "rumors on the job" of a stoppage.

Negotiations between Lance and Local 30 continued but were fruitless. On or about Saturday, January 7, 1961, Local 30's business agent informed Cox that he was going to picket the job. On Monday, January 9, Lance began working but left at 10:00 a. m. because of the cold. Either shortly before or shortly after Lance departed, pickets appeared. They remained until noon when they also left. Work continued as usual on the job although some employees of Beck and other subcontractors failed to return from lunch, apparently in the belief that the picket line would still be there. There was no more picketing as such until January 11, when all employees at the job, except for Lance's, refused to work after pickets from Local 30 appeared.

The picketing continued until January 17, the only work on the job being performed by Lance. The signs at all times clearly singled out Lance as the employer at whom the picketing was directed, and, except for the two hours on January 9, picketing occurred only when Lance was on the job. On January 17, Cox called Local 30's business agent and asked whether the picketing would cease if Lance left the job site. The answer being in the affirmative, Cox ordered Lance off the job. Lance has performed no further services, and no more pickets have appeared.

 Section 10(*l*) of the Act provides in part:

"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 8(b) of this title, or section 8(e) of this title, or section 8(b) (7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or re-

gional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate *injunctive relief pending the final ad-judication of the Board with respect to such matter.* Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law. * * * Upon filing of any such petition the courts shall cause notice thereof to be served upon any person involved in the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony * * *."

A court's function under Section 10(l) is not to resolve conflicts in testimony or to make an ultimate determination as to whether an unfair labor practice has in fact been committed. Rather, the court need find only that the Regional Director had reasonable cause to authorize issuance of a complaint and that the relief sought is appropriate. Schauffler v. Highway Truck Drivers & Helpers, Local 107, 3 Cir., 1956, 230 F.2d 7; Penello v. Wilmington Bldg. and Const. Trades Council, D.C.D.Del.1959, 177 F.Supp. 413. See also Petitioner's Memorandum, p. 11. Nevertheless, *Section 10(l) does not completely foreclose a court from the exercise of its judgment.* Congress, aware of the long and disputed history of the "labor

injunction" and of the fact that such decrees by themselves often end disputes in the employer's favor rather than preserve them for formal adjudication, surrounded their issuance with elaborate procedures and safeguards.[4] Under Section 10(l) the Regional Director must make a preliminary investigation and a finding of reasonable cause as to fact and law. He must then petition the appropriate district court for injunctive relief pending final adjudication by the Board. But the court may not grant such relief without allowing the respondent to present evidence on its behalf and without finding that there is evidence in the record to support the Regional Director's finding of reasonable cause. In this case petitioner has failed to support his findings, and the relief requested must be denied.

Section 8(b) (4) (i) (ii) (B) reads as follows:

"8(b) It shall be an unfair labor practice for a labor organization or its agents—

* * * * * *

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities *or to perform any services*; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

* * * * *

"(B) forcing or requiring any person to cease using, selling, han-

---

4. See generally N. L. R. B., Legislative History of the Labor-Management Relations Act of 1947 (1948). See also 29 U.S.C.A. §§ 176–180, dealing with so-called national emergency strikes. In two other provisions, 29 U.S.C.A. § 185 (damage actions for breach of collective agreements) and 29 U.S.C.A. § 187 (dam-

age actions for violations of 8(b) (4)), Congress refused to enact provisions allowing private parties to bring injunction suits. Injunctions in labor disputes are normally not available to private parties because of the provisions of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq.

dling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * * *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing."

The Act prohibits the use of either of two means to achieve a particular objective. In order to grant the relief requested, this Court, on the record before it, must find that there is reasonable cause to believe that Local 30 encouraged or induced employees to quit work or that it threatened, restrained, or coerced an employer. The Court further must find reasonable cause to believe that the objective of the use of either or both of these means was to force or require any person to cease doing business with any other person.

### The Alleged 8(b) (4) (i) (B) Violation

■ The theory upon which this alleged violation is based is that Local 30's picketing was intended to induce the employees of Beck and others to cease work in order to force or require Beck to cease doing business with Lance. Because the picketing occurred on premises which Lance occupied in common with other employers, including Beck, the picketing had such an effect. But proof of the effect is not proof of the violation, for the issue is the union's objective and Congress has, by the proviso to Section 8(b) (4) (B), specifically protected common situs picketing directed solely at the primary employer.[5] The Court of Appeals for the Fifth Circuit has stated:

" * * * [P]eaceful picketing upon common premises, directed solely against the primary employer with whom a labor dispute exists, is

still lawful under the Act, and * * any adverse effect upon secondary, neutral employers must necessarily be viewed as incidental to the lawful exercise of that statutory right." N. L. R. B. v. General Drivers, etc., Local 968, 5 Cir., 1955, 225 F.2d 205, 210.

The Court of Appeals for the District of Columbia has further added:

"The determining factor is the objective, the intendment, of the strike. The statute forbids a strike if an object of the strike is to induce a person not the primary employer or an employee of his to take some action such as ceasing to do business with the primary employer. The cases recognize the very practical fact that, intended or not, sought for or not, aimed for or not, employees of neutral employers do take action sympathetic with strikers and do put pressure on their own employers * * *. The question is the objective." Seafarers International Union of North America, Atlantic and Gulf Dist., Harbor and Inland Waterways Division, A.F.L.-C.I.O. v. N. L. R. B., 1959, 105 U.S.App.D.C. 211, 265 F.2d 585, 590. See also N. L. R. B. v. Denver Bldg. & Const. Trades Council, 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284.

■ The N. L. R. B. itself, in recognition of the problems raised by common situs picketing, has laid down certain evidentiary standards for evaluating the objectives of such picketing. These standards in general are:[6]

a) The picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's premises;

b) At the time of the picketing the primary employer is engaged in its normal business at the situs;

---

5. This provision was intended as a codification of existing case law. See H.Rep. No. 1147, 86th Cong., 1st Sess., p. 38 (1959). Senator Kennedy, as a manager of the amendments, reported that the proviso "clarified" the right to engage in

primary strikes and primary picketing "even though the employees of other employers refused to cross the picket line." 105 Cong.Rec. 16413–16414.

6. See Petitioner's Memorandum, pp. 6–7.

c) The picketing is limited to places reasonably close to the location of the situs;

d) The primary employer has no regular place of business in the area where the union can picket without directly involving employees of secondary employers; and

e) The picketing discloses clearly that the dispute is with the primary employer.[7]

While the courts have approved these standards in a general manner, they have flatly refused to apply them mechanically, in recognition of the fact that under the Act, the union's objective, not the quality of the means used, is the issue. Seafarers International Union, etc., v. N. L. R. B., supra; N. L. R. B. v. General Drivers, etc., Local 968, supra; Alpert v. Local 660, I. B. E. W., D.C.D.Conn. 1959, 169 F.Supp. 384. The standards are, therefore, not conclusive but merely helpful evidentiary guides, to be considered along with all other evidence available, in evaluating the union's purpose.

■ Petitioner bases his finding of reasonable cause upon several factors. The first is that Local 30 did not comply with the standards outlined above in that it picketed the job site rather than Lance's building in Middletown. The Court finds this contention wholly invalid. Lance's office in Middletown was hardly the center of its operations in the area, for it served only as a meeting place for employees in the morning. All equipment and materials were kept on the job site. Moreover, the dispute concerned the wages Lance was paying his employees on the Globe job and thus was certainly focused on the area which subsequently became the situs of the picketing. On facts less strong than these, such overwhelming reliance on findings of alternative places to picket has been rejected by the courts. N. L. R. B. v. General Drivers, etc., Local 968, supra;

Seafarers International Union, etc., v. N. L. R. B., supra. To hold otherwise on these facts is merely to encourage employers to rent "decoy" offices located away from operations which have resulted in labor disputes and, therefore, to ignore the congressional mandate "that nothing contained in this clause (B) shall be construed to make unlawful * * * any * * * primary picketing."

The next contention asserted by petitioner is that Local 30 has violated the Act by picketing for two hours on January 9 after Lance left the job. Only the most rigid and mechanical application of purely evidentiary standards can transform this into a violation. Lance started work on the 9th but decided to stop at 10:00 a. m. because of the cold. The pickets did not leave until two hours later, apparently after becoming convinced that Lance was not going to return. At no other time was there picketing when Lance was not present. The Court cannot understand how this minor slip is evidence of a union objective to force Beck to cease doing business with Lance or why it was anything but reasonable and natural under the circumstances. To give judicial approbation to such mechanical and conclusive application of a purely evidentiary standard is to ignore the congressional mandate by raising such a test to the status of a rule of law and to encourage the parties to engage in meaningless games of "hide and seek", with the use of the court's equity power turning on the outcome.

In contrast to petitioner's contention above, he also asserts that the union's willingness to remove the pickets at Cox's request and on the condition that Lance leave the job is evidence of a violation. To be sure, it is evidence of an effect of the picketing, but it in no way goes to the issue of the union's purpose. Moreover, had the picketing continued for any substantial time after it was certain that Lance's employees had left, a violation would clearly have been established. Lo-

---

7. There is no question but that the signs were in full compliance with these standards. Nor does petitioner challenge the positioning of the pickets at the job site, assuming the court finds that picketing anywhere at the site was legal.

cal 30's assent to Cox's request then, is evidence, not of a violation, but of compliance with the law.

Petitioner further contends that the statement made in December by Local 30's business agent to Lance's negotiator is evidence that the union had a prohibited purpose. The exact language employed is not clear, but it was to the effect that Lance should straighten the matter out "or else" or that if the matter was not settled, Local 30 would "tie the job up". This is insufficient to establish the necessary reasonable cause. Although this may be interpreted as a threat by the union to use economic coercion against Lance, it hardly establishes reasonable cause to believe that the subsequent picketing was directed against Beck. Moreover, an isolated statement, made to the primary employer in the midst of negotiations, cannot serve as the basis of an 8(b) (4) (i) (B) violation. At its very best, this isolated remark was a statement of hope or prediction, and a finding of an unfair labor practice cannot be founded upon it. In Seafarers International Union, etc., v. N. L. R. B., supra, it was stated:

> "Certain witnesses testified the Union 'hoped', or 'had a hope', that Todd employees would support it in its strike * * *. But hope and objective cannot be equated. Unions, like many other organizations, may hope for many things without making those things objects of their programs. Men have many hopes which are not objectives of action. If the statutory clauses here involved were to be interpreted as forbidding any strike in which a labor organization hoped that another employer would cease doing business with the primary employer, almost all strikes would be outlawed; we would suppose that almost all strikers hope other employees will support them,

with the natural results of such support." 265 F.2d 585, 592.

Finally, petitioner contends that although each factor viewed in isolation is insufficient, the totality of the union's conduct, when viewed as a whole, establishes reasonable cause. While the Court agrees that the record must be viewed in its entirety, it still finds that there is no support for petitioner's finding of reasonable cause. The union was picketing exactly where it had a right to picket. Its failure to leave immediately upon Lance's departure from the job on January 9 is of no probative value under the circumstances. Its willingness to discontinue picketing when Lance ultimately left the job on January 17 is evidence of a desire to comply with, not to violate, the law. In view of the foregoing, the isolated statement by Local 30's business agent to Lance is of no value. The petition based on Section 8(b) (4) (i) (B) must, therefore, be dismissed.

### The Alleged 8(b) (4) (ii) (B) Violation

In the 1959 amendments to the National Labor Relations Act, Congress made it illegal for a labor organization "to threaten, coerce, or restrain any person * * * where * * * an object thereof is * * * forcing or requiring any person * * * to cease doing business with any other person * * *." Petitioner contends there is reasonable cause to believe that Local 30 threatened Beck in order to force it to cease doing business with Lance.

Petitioner relies on three factors.[8] First, he asserts the statement by Local 30's business agent to Lance that the matter would have to be straightened out or the job would be tied up was a threat directed at Beck because it was made in Cox's presence. Second, petitioner contends this argument is bolstered by Cox's concern over the 45 yards of concrete

---

8. Any contention by petitioner that the picketing itself is sufficient may be rapidly disposed of. The (ii) portion of 8(b) (4) (B) is also subject to the proviso protecting "primary picketing", and any picketing prohibited by it must have as its "object" the activities described in subsection (B). The Court's discussion of the alleged (i) violation would, therefore, apply to any such contention.

which led to his request that Lance leave the job for a short time. This, the argument runs, is ample evidence that Cox was threatened. Third, petitioner again relies on the fact that the union replied in the affirmative when asked by Cox whether the pickets would be removed if Lance left the job.

Petitioner argues that this conduct, viewed in its totality, establishes reasonable cause to believe that a violation of 8(b) (4) (ii) (B) has occurred. He correctly and properly reminds the Court that this is a new provision and that the N. L. R. B. should be the first to place authoritative interpretations upon it. Although the Court is in the fullest accord with this general proposition, it cannot agree that there has been a sufficient showing of reasonable cause under any possible interpretation of the statute.

The alleged threatening statement was, in the first place, made to Lance, not to Cox. Moreover, it was made in the midst of negotiations, a situation in which threats are likely to be the rule rather than the exception. The fact that it was made in Cox's presence is of no help to petitioner, for it clearly appears in the record that Cox's office was the only place available for discussions on the job site. It is questionable whether any amount of expertise or administrative discretion can twist 8(b) (4) (ii) (B) into a pervasive regulation of the manners of union representatives in their negotiations with primary employers. Petitioner would like the Court to construe the section so that the ultimate effect of the union's conduct will be the governing consideration. Because 8(b) (4) (ii) (B) requires that such conduct be engaged in with a prohibited purpose in mind, the Court is doubtful that the end result of union activities will be more persuasive under

8(b) (4) (ii) (B) than it is under 8(b) (4) (i) (B). To be sure, the N. L. R. B., in its discretion, may draw certain inferences from particular conduct, but these must have some reasonable relationship to the ultimate issue of the union's purpose. In any case, these questions need not be resolved, for the Court finds no reasonable cause even under a test which allows the effect, rather than the purpose, of union activities to control. Cox testified that he was not threatened by any authorized representative of Local 30. He attributed his concern over the concrete to caution and the fact that he had heard "rumors" on the job that there might be a stoppage. On the record before the Court, petitioner's showing is patently insufficient, for he has established neither the threat nor the prohibited purpose.[9]

Petitioner's reliance on the union's willingness to remove the pickets once Lance left the job is again misplaced. Had such assent not been forthcoming, a violation of the Act would have been clearly established. Petitioner's theory apparently is that Cox's telephone call to Local 30's business agent indicates that Beck was coerced by the picketing into a cessation of business with Lance. In reply, the Court can only repeat that this is not evidence of the union's purpose and that such an assertion flies in the face of the stricture "that nothing contained in this clause (B) shall be construed to make unlawful * * * any * * * primary picketing."

The petition alleging a violation of Section 8(b) (4) (ii) (B) is likewise denied.

The foregoing opinion is adopted as the Court's findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a), 28 U.S.C.A. Let an appropriate order in conformity herewith be submitted.

9. Petitioner relies heavily on two cases which are easily distinguishable. In one the union told a secondary employer that he would be picketed unless the Associated General Contractors in the area blacklisted a particular subcontractor. In the other, the threat was contained in a letter sent to secondary employers. In both, then, the "threat" was made directly to the secondary employer and was of a deliberate nature.