Sidney **DANIELSON**, Acting Regional Director of the Second Region of the National Labor Relations Board, for and on Behalf of the **NATIONAL LABOR RELATIONS BOARD**, Petitioner,

v.

**PAINTERS DISTRICT COUNCIL NO. 20 OF WESTCHESTER AND PUTNAM COUNTIES, NEW YORK, BROTHERHOOD OF PAINTERS, DECORATORS AND PAPERHANGERS OF AMERICA, AFL–CIO**, Respondent.

No. 69 Civ. 3670.

United States District Court
S. D. New York.

Oct. 17, 1969.

David S. Burns, New York City, for petitioner.

Delson & Gordon, New York City, for respondent.

## OPINION

LASKER, District Judge.

This proceeding is before the court on a petition filed by the Acting Regional Director of the Second Region of the National Labor Relations Board ("the Board"), pursuant to Section 10(*l*) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(*l*), for a temporary injunction pending the final disposition of charges filed with the Board against respondent by Uni-Coat Spray Painting, Inc. ("Uni-Coat"). These charges allege that respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(b) (4) (i) (ii) (B) of the Act, which section proscribes so-called secondary boycotts and other secondary pressures to cause one person to cease

doing business with another person, as set forth in 29 U.S.C.A. § 158(b) (4) (i) (ii) (B).

Section 10(*l*) of the Act provides that where a charge has been filed alleging a violation of Section 8(b) (4) (B), if the Board "has reasonable cause to believe such charge is true," it shall petition a United States District Court for appropriate injunctive relief pending final adjudication by the Board. A hearing on the issues raised by this petition and answer was held on September 16, 1969, and the following facts, which are basically not in dispute, were adduced.

Respondent Painters District Council No. 20 of Westchester and Putnam Counties, New York ("the District Council") has a collective bargaining agreement with various painting contractors of Westchester County, including Uni-Coat. Rule 9(a) of Article III of that agreement provides, in pertinent part, that "(t)he spraying of acoustic ceilings and wall surfaces or decorative effects which it is impossible to brush, shall be permitted upon receiving permission from District Council No. 20."

Baker-Firestone, Inc. ("Baker-Firestone") is the general contractor for the construction of a garden apartment complex on Kings Ferry Road in Montrose, New York. The actual construction work is being performed by subcontractors, although certain Baker-Firestone employees are employed at the job site in a supervisory capacity. Sometime prior to July, 1969, Rocco Gallo, vice-president of Uni-Coat, personally contacted Jack Hon, Baker-Firestone's project engineer for the Montrose job, to discuss the possibility of Uni-Coat acting as painting subcontractor. Gallo informed Hon that if Uni-Coat were hired, it would be able to paint with a particular product known as Qualiware. Hon, who had had some prior favorable experience with Qualiware, hired Uni-Coat as the painting subcontractor on the Kings Ferry job. The contract between Baker-Firestone and Uni-Coat, dated May 21, 1969, specified that Qualiware was to be used for interior painting while Benjamin Moore Company paint or its equivalent was to be used on the exterior. The contract also stated that Qualiware was to be applied in accordance with the manufacturer's specifications.

In order to be able to use Qualiware on construction projects, Uni-Coat had secured a license from D.A.W. Rainbow Painting Company, Inc. ("D.A.W."), a Missouri corporation, which invented and holds title to Qualiware, and a contract from Qualiware Sales Corporation ("Qualiware Sales"), a Missouri corporation, the company that sells Qualiware under an exclusive license from D.A.W. Gallo, Uni-Coat's vice-president, had first become interested in Qualiware after reading a D.A.W. advertisement in one of the trade magazines. Soon thereafter, he traveled to St. Louis to take a firsthand look at the product. Duly impressed, Gallo negotiated with Donald Williams, president of D.A.W. and Qualiware Sales, for the aforesaid licensing agreement. Both this agreement, dated April 17, 1969, and the contract with Qualiware Sales provided that Uni-Coat's right to use Qualiware was conditioned upon its adherence to the manufacturer's specifications for the product. Qualiware is manufactured for D.A.W. by St. Louis Mfg. Co. ("St. Louis Mfg.") under an exclusive license agreement from D.A.W. in accordance with D.A.W.'s standards and specifications, which provide, *inter alia,* that Qualiware is to be applied only by spraying.

On or about June 30, 1969, prior to commencing work at the Montrose job site, Uni-Coat demonstrated the application of Qualiware to representatives of the respondent union in order to secure the requisite permission from District Council No. 20 to spray wall surfaces. Following the demonstration, which took place at Baker-Firestone's job site, the District Council concluded that Qualiware could be properly applied on the job by being rolled and/or brushed, as well as sprayed, and therefore, pursuant to Rule 9 of the collective bargaining agreement, refused to authorize spray

painting. On or about July 3, 1969, at the request of Uni-Coat, a second meeting took place—this time in the District Council's headquarters—between respondent's representatives and those of Uni-Coat, Baker-Firestone, D.A.W. and Qualiware Sales. At this meeting Donald Williams, president of D.A.W. and Qualiware Sales, stated that Qualiware could not be properly rolled or brushed and that if it was not sprayed he could not guarantee the job or the materials used therein. Respondent, for its part, continued to oppose the application of Qualiware by spraying, and at no subsequent time was permission ever granted.

On the morning of July 7, 1969, Uni-Coat appeared at the Montrose job site and commenced spray painting eleven model apartments. Although the painting subcontract called for the spraying of some 210 dwelling units, the eleven model apartments were the only ones ready to paint at the time. At about 11:00 a. m. Uni-Coat notified respondent that it was on the job, and around noon District Council members began picketing the construction site. They carried signs bearing the following legend:

"The Painting Contractor on This Job Does Not Observe The Contract With District Council 20, AFL–CIO."

Uni-Coat ceased painting at 1:30 p. m., having completed the kitchens in the eleven model apartments. Respondent informed Hon, project manager for Baker-Firestone, that the picketing would continue until respondent received assurances that no further spraying would occur. Hon then delivered identical letters to Uni-Coat and District Council 20, directing Uni-Coat to stop work on the job until a mutually satisfactory resolution of the problem could be effected. The picketing ceased at around 4:00 p. m. Prior to that time, one delivery truck had refused to cross the picket line and on the following day the electricians and plumbers failed to report for work. They returned the next day after Hon informed their employers that the picketing had stopped. The evidence is conflicting and inconclusive as to the occurrences between July 7th and July 21st.

On July 21st, pursuant to instructions from Hon, Uni-Coat, apparently without notifying respondent, returned to the job site to complete the spraying of the eleven model apartments. Uni-Coat departed later that afternoon, with the doors and some touching up remaining to be done. This work was never completed by Uni-Coat, who did not return to the job thereafter. No picketing took place on this day.

From July 22nd through July 24th, however, members of the District Council picketed the job site, carrying signs similar to those used on July 7th. During this period various building trades employees employed by other employer-subcontractors failed to report or otherwise refused to work. On the evening of July 24th, a meeting was held between respondent's representatives and those of Baker-Firestone. At that meeting, Baker-Firestone inquired as to what could be done to stop the picketing, and respondent stated that its objection was to the spraying being done by Uni-Coat and not to Uni-Coat itself. The District Council and Baker-Firestone then signed a written statement by which Baker-Firestone undertook, in pertinent part, to dismiss any painting contractor who did not adhere to the terms of the District Council's trade agreement. There was no further picketing after July 24th. Subsequently, Baker-Firestone terminated the services of Uni-Coat. In the middle of August, 1969, Baker-Firestone hired Hochberg Brothers, a painting contractor in Dobbs Ferry, New York, to complete the painting of the eleven model apartments left unfinished by Uni-Coat.

\* \* \*

 It is clearly not a court's function under Section 10(l) to make an ultimate determination as to whether the charges being heard by the Board are true or whether an unfair labor practice has in fact been committed. Any final adjudication of such matters lies clearly

within the Board's province. The court's responsibility is to determine whether the Regional Director had reasonable cause to authorize issuance of a complaint and, if so, whether the injunctive relief sought by the motion is "just and proper." 29 U.S.C.A. § 160(*l*). As Judge Wyzanski has stated:

> "What a court must do is to appraise the whole situation, exercising the best judgment it can as to what is the general scope of the facts likely to be proved before the Board, what are the issues of law, and how clear it is what rule of law would be and should be applied by the Board." Alpert v. United Steelworkers of America, etc. (D.Mass.1956), 141 F.Supp. 447, 450.

See also Schauffler v. Local 30, United Slate, etc. Wkrs.' Ass'n (D.Del.1961), 191 F.Supp. 237 (opinion of Chief Judge Wright).

Since I find that there is serious doubt as to whether the Regional Director had reasonable cause to authorize the issuance of a complaint in this proceeding and that the issuance of an injunction would therefore not be "just and proper" within the meaning of the statute, the relief requested is denied.

Section 8(b) (4) (i) (ii) (B) provides as follows:

> "8(b) It shall be an unfair labor practice for a labor organization or its agents—
> "(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in any industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is * * *
> "(B) forcing or requiring any person to cease using, selling, handling,

transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *."

■ Section 8(b) (4) (B) is aimed at so-called secondary boycotts and is not intended to apply to primary activities. It was Congress' intent to protect "employers in the position of neutrals between contending parties." National Woodwork Manufacturers Ass'n v. N. L. R. B., 386 U.S. 612, 625, 87 S.Ct. 1250, 1258, 18 L.Ed.2d 357 (1967). The issue, therefore, is whether the dispute is between the union and the person against whom the union's action (i. e., the picketing) is directed or between the union and another person. Thus, the question here is whether the primary dispute was in fact, as the District Council argues, with Uni-Coat or whether Uni-Coat was, as the Board contends, a neutral or secondary employer and the innocent target of respondent's principal dispute with D.A.W., St. Louis Mfg., and Qualiware Sales.

■■ The theory upon which the alleged violation is based is that both Uni-Coat and Baker-Firestone were neutral secondary employers within the meaning of Section 8(b) (4) (B) and that D.A.W., St. Louis Mfg., and Qualiware Sales were all primary employers. Petitioner contends that the District Council's picketing of the Montrose job site was designed solely to force Baker-Firestone, the general contractor, to cease doing business with D.A.W., St. Louis Mfg., and Qualiware Sales. Petitioner justifies this theory on the basis of the Board's "right to control" test, the analytical tool by which the Board has for some years now determined whether an employer such as Uni-Coat is a primary or a neutral secondary employer. Judge Prettyman has explained the "right to control" test as follows:

> " * * * The basic criterion is, as the statute (Section 8(b) (4)) specifically provides, the object, or objects, of the union action. So the problem

is: What was the object? The Board has held several times that, if a union demands that a contractor do something he is powerless to do except by ceasing to do business with somebody not involved in the dispute, it is manifest that an object of the union is to induce this cessation of business * * *." Ohio Valley Carpenters District Council, U. B. of C. v. N. L. R. B. (6th Cir. 1964) 339 F.2d 142, 145. In other words, the Board will look to see whether the party being picketed has the power to change conditions to satisfy the union's demands. If the party could respond and alter conditions to satisfy the union, then he is a primary employer and the picketing is deemed to be primary. But if the party does not have the right to control the conditions, then he is a neutral employer and the union's picketing such an employer is secondary activity proscribed by the Act. Succinctly put, the "right to control" doctrine holds "that employees can never [legally] strike against their own employer about a matter over which he lacks the legal power to grant their demand." National Woodwork Manufacturers Ass'n v. N. L. R. B., supra, 386 U.S. at 617, n. 3, 87 S.Ct. at 1254.

■ In light of this test, the Board contends that, while the object of the District Council's picketing was to prevent Uni-Coat from spray painting on the Baker-Firestone job, neither Uni-Coat nor Baker-Firestone exercised, or, according to Uni-Coat's contract with Qualiware Sales, had the right to exercise, any control over the manner in which Qualiware was to be applied. The Board reasons this way: Baker-Firestone's contract with Uni-Coat provided that Qualiware was to be used on the job in accordance with the manufacturer's specifications; Uni-Coat's license from D.A.W. and its contract with Qualiware Sales were conditioned upon Uni-Coat's applying Qualiware in accordance with the manufacturer's specifications; and the manufacturer's specifications clearly provided that Uni-Coat was to apply Qualiware by spraying. Thus, the Board contends, only D.A.W., which determines the manufacturer's specifications, had the authority to allow Uni-Coat to apply Qualiware by some means other than spraying, and D.A.W. had stated that it would not allow any other method of application. Therefore, as petitioner would have it, the District Council, by picketing Uni-Coat in order to prevent the spraying of Qualiware, was attempting to obtain a result that Uni-Coat itself was powerless to grant and, in so doing, was engaging, according to the "right to control" test, in proscribed secondary activity. We disagree.

Even assuming *arguendo* the validity of the "right to control" test, it seems untenable that the doctrine was ever meant to embrace the set of facts presented to the court in the instant case. Here, we are confronted with an employer, Uni-Coat, who from the very start seemed bent on touching the forbidden fruit. It was Uni-Coat who, upon reading of Qualiware in a magazine advertisement, actively and deliberately sought out D.A.W. in St. Louis and secured a license to spray Qualiware, thereby gratuitously launching itself into the very business explicitly prohibited by its collective bargaining agreement with the District Council. By its very nature, such a business would have to depend for its success upon repeated violations by Uni-Coat of its existing agreement with the union. As a natural consequence, in an effort to exploit its license, soon thereafter Uni-Coat, with full knowledge of its contract with the District Council, personally contacted Hon of Baker-Firestone, informed him of Uni-Coat's license to spray Qualiware, and thereby persuaded him to give Uni-Coat the painting subcontract on the Montrose job. Uni-Coat's actions, far from suggesting a state of powerlessness, rather indicate a continual state of control over its affairs. While it may be true that Uni-Coat eventually managed to sign away its control over spray painting rights through a series of restrictive contracts, it cannot be denied that it was Uni-Coat itself which invited these restrictions,

first by seeking a license to spray Quali-ware from D.A.W. and then by selling the idea of Qualiware to Baker-Firestone. And, too, there appears to be no evidence either that Uni-Coat ever attempted to comply with the union's demands by suggesting the use of a non-spray paint to Baker-Firestone or that Baker-Firestone ever did, or, if the problem were objectively presented, ever would, insist absolutely on the use of Qualiware spray paint. Indeed, inasmuch as it was Uni-Coat, and not Baker-Firestone, which initially suggested using Qualiware, it is not unlikely that Baker-Firestone, especially under the difficult circumstances, would have been amenable to some other suggestion had it been forthcoming from Uni-Coat. That Baker-Firestone did in fact, following Uni-Coat's dismissal, hire Hochberg to complete the model apartments with a non-spray paint lends credence to this argument.

It would be unthinkable to apply the "right to control" test to facts such as those just outlined. To do so would be to encourage subcontractor employers to undermine their collective bargaining agreements by actively soliciting contracts whose very terms called for conduct violative of those trade agreements, which is, of course, precisely what Uni-Coat did here. Manufacturers and general contractors, too, would be tempted to insert all manner of specification and standard into their licenses and contracts with a total disregard of subcontractors' commitments to their respective unions.

Petitioner contends that the instant case is governed by prior Board decisions involving architectural specifications in construction subcontracts. See, e. g., Mechanical Contractors Ass'n of Detroit, Inc., 177 N.L.R.B. No. 14 (1969); Mechanical Contractors Ass'n of Cleveland, Inc., 168 N.L.R.B. No. 138 (1968); National Woodwork Manufacturers Ass'n, 149 N.L.R.B. 646, 657, 658, aff'd in pertinent part 354 F.2d 594 (7th Cir. 1965). In those cases it was held that where architectural specifications included in construction subcontracts provided for the installation of building components manufactured in a certain way, it was a violation of Section 8(b) (4) (B) for a union to induce the subcontractor's employees not to handle or work upon these items, or to threaten to refuse to permit their installation, solely because of the union's objection to the manner in which they were manufactured. In deciding these cases, the Board clearly relied on the "right to control" test, finding that the respective subcontractors were caught between the conflicting demands of their architects and unions and, as such, were powerless to resolve the conflict in the manner desired by the unions. These cases are distinguishable from the one at hand. In these cases, the objectionable specifications were made public long ahead of time and all contending subcontractors were obliged to submit their bids in reliance thereon or else not bid at all. In other words, these restrictions were imposed in advance upon all bidding subcontractors as a condition of employment. It was a "take it or leave it" proposition. Unlike the present case, these subcontractors did not deliberately approach their respective architects and/or general contractors and invite the very restrictions so offensive to the letter and spirit of their trade agreements. Unlike our case, too, these subcontractors did not voluntarily organize themselves for the purpose of doing precisely what their collective bargaining contracts forbade. Rather, they found themselves in the rather helpless position of having to compete for a particular job a small element of which was in conflict with their trade agreements. But, unlike Uni-Coat, they in no way fostered and fomented that conflict.

Petitioner also relies for support on the opinion of the Court of Appeals of this Circuit in the leading case of N. L. R. B. v. Enterprise Ass'n, etc., 285 F.2d 642 (1960). Its reliance is misplaced. We shall assume *arguendo* that the court in *Enterprise* intended to follow the "right to control" doctrine, although this proposition seems somewhat questionable inasmuch as the opinion was an-

nounced almost a decade ago, even before the Board itself had clearly enunciated its control test, the court itself never explicitly professed to be relying on the test, and the facts of the case would appear to fall well outside the factual framework of the typical "right to control" case described above. Nevertheless, even when analyzed under the "right to control" standard, *Enterprise* is clearly distinguishable from the instant case. In *Enterprise* the owner awarded to the contractor a general piping contract under which the contractor was obliged to fabricate and install such piping as the owner would provide for the project. The contractor also had a collective bargaining agreement with his employees' union. One provision of that agreement prohibited the subcontracting of pipe fabrication. Later, the contractor, in violation of his trade agreement, subcontracted the fabrication of certain piping systems to a supply company. When the pipe arrived from the supply company, the contractor's employees refused to install it. Thereupon the contractor informed the owner that it could not perform certain of the pipe fabrication on schedule. The owner then exercised its contractual privilege to withdraw such work from the contractor and awarded it, without the advice or knowledge of the contractor, to another pipe fabricator. When the new fabricator's pipe came in, the contractor's employees, on instructions from their union, refused to install it. On these facts the court rightly found a violation of Section 8(b) (4) (B). For when the contractor's employees refused to handle the new fabricator's pipe, the fabrication of the pipe was no longer a part of the contractor's contract with the owner. The owner had unilaterally and completely removed the objectionable work from the contractor's contract, and it was now, as the court said, "an operation wholly within the control of [the owner] and hence not within [the contractor's, i.e., employer's] contract with the respondent union." Id. at 645. Thus, proscribed secondary activity was clearly established, for the union's refusal to handle the new fabricator's pipe had as an object to compel the owner to cease doing business with the fabricator-nonemployer and to cease using pipe fabricated by any employer other than the contractor-employer. Not only did the contractor lack the power to meet the union's demands, but, what is even more striking, he appeared to lack any connection with them whatsoever. As noted above, he had been removed from the conflict. In our case, Uni-Coat was neither a powerless nor a dissociated party. It was Uni-Coat's actions, and Uni-Coat's actions alone, that affronted the union, and it would appear that Uni-Coat had both the power and the connection to resolve the dispute, or if it did not, had voluntarily forfeited them.

█ It should perhaps be noted in passing that, even if the facts revealed, as they do not, that Uni-Coat was powerless to meet the union's demands, this court would still be hesitant to grant the relief here requested by petitioner. This hesitancy derives in no small measure from serious reservations we entertain regarding the continued vitality of the "right to control" test as a means of analyzing the primary-secondary dichotomy. While it may well be that an employer in contractual relations with a union is not in all cases a "primary" employer within the meaning of the statute, the proper test, as the Court of Appeals for the District of Columbia noted long ago, is "whether the contract provisions in question [in the collective bargaining agreement] extend beyond the employer and are aimed really at the union's difference with another employer." Local No. 636, United Ass'n of Journeymen, etc. v. N. L. R. B., 108 U.S.App.D.C. 24, 278 F.2d 858, 864 (1960). The Supreme Court itself may already have given tacit approval to just such a test. In National Woodwork Manufacturers Ass'n v. N. L. R. B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), the court, although expressly reserving judgment on the "right to

control" issue, made it quite clear that the proper test for determining whether a Section 8(b) (4) (B) violation has occurred is whether, under *all* the surrounding circumstances, the conduct of the union has as its objective the preservation of work for unit employees, or whether the agreements and boycotts are tactically calculated to satisfy the union's objectives elsewhere.

> "The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-a-vis* his own employees." Id. at 645, 87 S.Ct. at 1268.

■ Under this test, it would appear that a violation has not been established in the instant case. It is clear here that the union's conduct was addressed to the enforcement of its collective bargaining agreement and related solely to the preservation of work for its members. The District Council's picketing was directed against Uni-Coat for violating its contract with the union by spray painting without permission. The clear purpose of the restriction on indiscriminate spray painting was to protect the job security and work of union members, and the purpose of respondent's picketing was solely to effect that limited objective. The union entertained no remote objectives elsewhere, but was only concerned with affecting labor relations between Uni-Coat, the contracting employer, and respondent on behalf of its members. Under the language of *National Woodwork,* the union's conduct here, while coercive, should not be deemed violative of the secondary boycott provisions of the Act.

It may be significant that in the two years since the decision in *National Woodwork* several Circuit Courts have already rejected the Board's "right to control" test as the sole determinative factor in primary-secondary analysis. See American Boiler Manufacturers Ass'n v. N. L. R. B., 404 F.2d 556 (8th Cir. 1969); and Beacon Castle Square Building Corp. v. N. L. R. B., 406 F.2d 188 (1st Cir. 1969). In N. L. R. B. v. Local Union No. 164, Int. Bro. of Electrical Wkrs., 388 F.2d 105, 109 (3rd Cir. 1968), the court stated:

> "Certainly it [the right to control] was a relevant fact for the Board to consider in deciding whether respondent's strike also had an illegal object. We agree that it would not be decisive proof of such a charge, * * *. Indeed, if the Board's decision can be said to stand for the legal proposition that the absence of the right to control is itself of decisive significance here, we cannot agree."

■ Such a reading of the language of *National Woodwork* does not appear unwarranted. While the presence of a right to control may indeed earmark an employer as a proper subject for primary picketing, the reverse—that is, that the absence of a right to control renders an employer immune from all primary activity—is not necessarily true. For it is not inconceivable that under the Supreme Court's approach in *National Woodwork* an employer might lack the right to control and still properly be subject to primary union activity, assuming that the purpose of such activity was the preservation of work for the union's members. Lack of control might, of course, be highly relevant to a determination of whether a union was pursuing an illegal objective. Nevertheless, it should not be deemed incontrovertible proof of such a charge. The view that the "right to control" should not be determinative as to whether a Section 8(b) (4) (B) violation has occurred is also supported by the dissenting opinion of Mr. Justice Stewart (joined by Justices Black, Douglas and Clark) in *National Woodwork*. There, the dissenters argue that all product boycotts are violative of the section and that the Board's concept of "control" lacks "relevance to the correct determination of whether a § 8(b) (4) (B) violation has occurred." 386 U.S. at 659, n. 15, 87 S.Ct. at 1276. In any event, these profound considerations are not necessary to a determination of the instant case, for even an un-

adulterated application of the Board's "right to control" rule would find the petitioner's charge wanting.

Finally, petitioner contends that, even if Uni-Coat were a primary employer, respondent would still be guilty of picketing for a proscribed secondary object because it picketed for a three-day period after Uni-Coat had left the job site on July 21. Petitioner argues that respondent's conduct in picketing the Kings Ferry job site for three days after Uni-Coat left could only be intended to induce the employees of Baker-Firestone's other subcontractors to cease work in order to compel Baker-Firestone to remove Uni-Coat from the job. Since the picketing occurred on premises which Uni-Coat occupied in common with other Baker-Firestone subcontractors, of course the picketing did in fact have such an effect, for, as noted earlier, during this period (July 22–24) various building trades employees of other subcontractors failed to report and otherwise refused to work. As further evidence of a violation, petitioner points to the fact that respondent ceased picketing only after Baker-Firestone signed a written agreement promising to dismiss any painting contractor who did not adhere to the terms of the union's trade agreement. To be sure, these facts do provide evidence as to the effect of the picketing. "But proof of the effect is not proof of the violation, for the issue is the union's objective and Congress has, by the proviso to Section 8(b) (4) (B), specifically protected common situs picketing directed solely at the primary employer." Schauffler v. Local 30, United Slate, etc., Wkrs.' Ass'n, supra, 191 F.Supp. at 241. That respondent's picketing adversely affected Baker-Firestone and that Baker-Firestone wanted to put an end to the picketing cannot be denied, but these facts alone do not constitute a violation. As the Court of Appeals for the District of Columbia has stated:

"The determining factor is the objective, the intendment, of the strike. The statute forbids a strike if an object of the strike is to induce a person not the primary employer or an employee of his to take some action such as ceasing to do business with the primary employer. The cases recognize the very practical fact that, intended or not, sought for or not, aimed for or not, employees of neutral employers do take action sympathetic with strikers and do put pressure on their own employers. * * * The question is the objective." Seafarers International Union of North America, etc. v. N. L. R. B., 105 U.S.App.D.C. 211, 265 F.2d 585, 590 (1959).

To assist in determining whether a union's picketing at a common situs is directed at the primary employer, and therefore permissible, or at a secondary employer, and therefore proscribed by the Act, the Board in Moore Dry Dock Company, 92 N.L.R.B. 547, 549, laid down certain evidentiary standards for evaluating the objectives of such picketing. In general, the standards are as follows:

a) The picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's premises;

b) At the time of the picketing the primary employer is engaged in its normal business at the situs;

c) The picketing is limited to places reasonably close to the location of the situs;

d) The primary employer has no regular place of business in the area where the union can picket without directly involving employees of secondary employers; and

e) The picketing discloses clearly that the dispute is with the primary employer.

The Board asserts that the District Council, by picketing for a three-day period after Uni-Coat "completed" work on the model apartments and left the job, violated the second requirement of Moore Dry Dock. This assertion, however, rests on a faulty understanding of the facts. For the record clearly re-

veals that Uni-Coat had *not* completed its work when it left the job site. Not only had it left unfinished the work on the eleven model apartments, but it had not even begun work on the balance of the 210 dwelling units it had contracted to paint for Baker-Firestone. That Uni-Coat had not completed painting the model apartments is obvious from the fact that Baker-Firestone was obliged to hire another painter, Hochberg Brothers, to finish the job left undone by Uni-Coat. Although the second requirement of *Moore Dry Dock* states that "at the time of the picketing the primary employer [must] be engaged in its normal business at the situs," neither the courts nor the Board have ever interpreted this standard to require the employer to be physically present at the job site at all times during the course of the picketing. The cases have held that where the primary employer is not physically on the job but is still engaged in working there, the requirement is deemed to be satisfied. See, e. g., I. B. E. W., Local 861 and Brownfield Electric, Inc., 145 N.L.R.B. 113 (1964); Schauffler v. Local 30, United Slate, etc., supra; Lebus for and on Behalf of N. L. R. B. v. Intern. Broth. of Electrical Workers, I. B. E. W., Local 861, 192 F.Supp. 485 (W.D.La.1961). In the instant case, whether or not Uni-Coat's employees were actually present at the job site or not, there is no question but that they still had work to complete and that, on the basis of past history, the union could reasonably expect that Uni-Coat would return,—perhaps, as had happened once before, without any notification to the District Council. As the *Lebus* court noted:

"An employer is not to be permitted to transform a picket line from a legal one to an illegal one merely by moving his employees away when pickets arrive." Id. at 488.

It must be remembered that the *Moore Dry Dock* standards are no more than helpful evidentiary guides to be considered along with all other evidence available in evaluating the union's ob-

jectives. To apply these standards in any more rigid a way would be "to ignore the congressional mandate by raising such a test to the status of a rule of law and to encourage the parties to engage in meaningless games of 'hide and seek', with the use of the court's equity power turning on the outcome." *Schauffler,* supra, 191 F.Supp. at 242.

No reasonable cause exists to believe that respondent has violated the Act. The motion for an injunction is denied.

It is so ordered.