LOCAL UNION NO. 636, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 23342.

United States Court of Appeals, District of Columbia Circuit.

Argued June 12, 1970.

Decided July 29, 1970.

Mr. Patrick C. O'Donoghue, Washington, D.C., with whom Mr. Martin F. O'Donoghue, Washington, D.C., was on the brief, for petitioner.

Mr. Ian D. Lanoff, Atty., National Labor Relations Board, of the bar of the Supreme Court of Illinois, pro hac vice by special leave of court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Glen M. Bendixsen, Atty., National Labor Relations Board, were on the brief, for respondent.

Messrs. Kenneth C. McGuiness and Wayne S. Bishop, Washington, D.C., filed a brief on behalf of Air-Conditioning and Refrigeration Institute et al. as amici curiae.

Before WRIGHT, LEVENTHAL and MacKINNON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

The National Labor Relations Board found that the petitioner union engaged in unfair labor practices within the meaning of Section 8(b) (4) (i) and (ii) (B) of the National Labor Relations Act, 29 U.S.C. § 158(b) (4) (i) and (ii) (B) (1964). In finding that the union had engaged in proscribed secondary activity, the Board relied exclusively on its "right to control" test. For the reasons set out below, we believe this reliance was misplaced, and we reverse the Board's finding.

I

The facts are undisputed. At all times relevant to this case Local 636 of the plumbers' and pipefitters' union had a collective bargaining agreement with two multi-employer associations, the Metropolitan Detroit Plumbing Contractors Association and the Mechanical Contractors Association of Detroit, Inc. This contract contained a work-preservation clause which specified that "[a]ll pipe two inches (2″) and under and all hanger rods are to be cut, threaded, and installed by employees on the job." The trial examiner found that "[s]imilar language has appeared in collective-bargaining contracts between [the union] and associations of plumbing and mechanical contractors since about 1941, and [the union] has successfully resisted efforts to delete it." The Board does not challenge the validity of this clause in these proceedings.

The present case has its origin in the 1964 decision by Holy Cross Hospital in Detroit to construct an addition to its building. The hospital retained an architect who designed the new addition and drew up plans and specifications for its construction. In planning the heating and air conditioning system of the new building, the architect specified individual room heating and cooling "fan coil units." These units became the focus of the present dispute.

Fan coil units contain a certain amount of piping associated with temperature control valves which are contained in each unit. This piping is less than two inches in diameter, and it can be cut, threaded and installed either at the factory or on the job site. As prepared by the hospital's architect, the specifications for the addition to Holy Cross Hospital called for the fan coil units to be "pre-piped," that is, for the piping to be installed at the factory. Furthermore, the mechanical specifications provided that the hospital's architect "shall interpret the Specifications * * * and shall decide all other questions in connection with the work."

In 1966, the hospital advertised for bids on the basis of the architect's plans and specifications, which included the fan coil provisions discussed above.

Page Plumbing and Heating Company was the successful bidder, and the Board found as a matter of fact that "[a]ll bidders, including Page, were advised of this specification [factory pre-piping] and submitted their bids in reliance thereon." Page Plumbing was at all times a member of the Mechanical Contractors Association of Detroit, Inc. and a signatory of the collective bargaining agreement with Local 636 which included the clause preserving the installation of all pipe less than two inches in diameter for job site workers.

The ensuing clash was completely predictable. Holy Cross Hospital sought to hold Page to the contract specifications of factory pre-piped fan coil units. The union, in turn, sought to hold Page to the collective bargaining agreement. When the hospital refused Page's request that the piping be done on the job site, the union induced the employees of Page at the Holy Cross Hospital job site not to handle the factory preassembled units.

## II

On the basis of these facts, the Board, applying its "right to control" test, found the union guilty of an unfair labor practice:

"It is obvious from the foregoing facts that Page, although willing to do so, was powerless to comply with Respondent's demand. As the Hospital through its architect would not relax or change the specifications for the job, a strike against Page would be fruitless in terms of achieving Respondent's objective, *unless* Page's customer, the Hospital or its architect, was thereby persuaded to change the contract specifications so as to permit Page's employees to fabricate certain piping on the job. In the real and practical sense Page was a neutral; it was caught between the conflicting demands of the Respondent and the Hospital, and was without power to resolve the conflict in the manner desired by Respondent. Section 8(b) (4) of the Act was intended to protect 'employers in the position of neutrals between contending parties.' Inasmuch as Page was incapable of complying with respondent's demands, an object of Respondent's conduct directed at Page must inevitably have been to cause Page to rescind its contract and thus cease doing business with the Hospital, a violation of Section 8(b) (4) (B) of the Act."

(Footnotes omitted; emphasis by the Board.)

We think the Board's analysis is completely wide of the mark.[1] To assert that Page lacked the "right to control" here requires a most careful artificial structuring of the facts. Before Page entered into the contract with the hospital, Page had a contractual commitment to the union to reserve certain work for job site workers. During the negotiations with the hospital over the specifications in the bid, Page was, of course, apprised of the specifications which conflicted with its collective bargaining agreement with the union. Eyes open, Page then signed the hospital contract.

The Board seeks to disregard these threshold facts, and focus exclusively on Page's predicament *after* it had signed the hospital's contract. But Page created its own predicament, and the Board's approach would encourage and reward such behavior. Judge Lasker accurately appraised a similar situation:

"It would be unthinkable to apply the 'right to control' test to facts such as those just outlined. To do so would be to encourage * * * employers to undermine their collective

1. The Board's opinion holds that Local 636 engaged in an unfair labor practice by striking Page since the union's real dispute was with the hospital. The trial examiner's theory was slightly different; he found the union's action an unfair labor practice because it induced both Page and the hospital to "cease doing business" with Schemenauer Manufacturing Company, the manufacturer of the pre-piped fan coil units. Our view of the case rejects both formulations.

bargaining agreements by actively soliciting contracts whose very terms called for conduct violative of those trade agreements * * *. Manufacturers and general contractors, too, would be tempted to insert all manner of specification and standard[s] into their licenses and contracts with a total disregard of subcontractors' commitments to their respective unions." Danielson v. Painters District Council No. 20, etc., S.D.N.Y., 305 F.Supp. 1108, 1115 (1969).

Moreover, the Board's application of the "right to control" test completely ignores the teaching of the Supreme Court in National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). In that case, the Court held that the proper basis for distinguishing primary from secondary union activity was

> "an inquiry into whether, under all the surrounding circumstances, the Union's objective was preservation of work for [unit] employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere. Were the latter the case, * * * the boycotted employer would be a neutral bystander, and the agreement or boycott would, within the intent of Congress, become secondary. There need not be an actual dispute with the boycotted employer * * * for the activity to fall within this category, so long as the tactical object of the agreement and its maintenance is that employer, or benefits to other than the boycotting employees or other employees of the primary employer thus making the agreement or boycott secondary in its

aim. *The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-à-vis his own employees. * * **"* 386 U.S. at 644–645, 87 S.Ct. at 1268. (Footnotes omitted; emphasis added.)

Thus the *National Woodwork* test focuses on whether the employees have a dispute with their own employer. Is it proper to bring pressure to bear on him because it is his dispute? Or is he a "neutral" on whom the union is bringing pressure to attain objectives elsewhere? In our view, the "right to control" test, as formulated by the Board, is irrelevant to this determination and tends to focus attention on the wrong factors. The union's position is that it is seeking to preserve the work of Page's employees from being eliminated by factory prefabrication. It is this claim of primary activity which the Board must appraise.

No claim has ever been made that Local 636 has any interest at all in the labor relations of Holy Cross Hospital, the usual type of "secondary" object. If the union had any objective with regard to the hospital, it was to convince the hospital not to use pre-piped units.[2] But focusing on this aspect of the case makes for faulty analysis: the whole point of the work-preservation agreement in this case, as in *National Woodwork,* was to convince builders generally not to use prefabricated materials. Work-preservation clauses, of necessity, will have effect by a domino-like process: the union negotiates the restriction with its employer—the contractor. The contractor, bound by his collective bargaining agreement, will not contract

2. There is no indication in this case that work done at the job site varied to any material extent, in either cost or quality, from that produced as prefabricated material at a factory. These factors may be important in the context of labor-management negotiations. Moreover, it may be open to the union's employer to "purchase" the right to use prefabricated materials by paying union members what they would have earned if they had performed the work in question. But the Supreme Court in National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 644, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), held that these "economic and technological factors" were not to be part of the primary-secondary distinction. Rather the Court said that arguments for limiting the scope of collective bargaining activity based on these considerations should be addressed to Congress.

with a builder who seeks to use prefabricated materials. The builder may then accede to the demand that the work be done at the job site, or he may seek another contractor not bound by such a restrictive union contract.

Therefore, in one sense the ultimate "right to control" in many decisions which bear on the work-preservation clause will be in a party other than the union's immediate employer. Similarly, the work preservation agreement between the union and the immediate employer may have the effect of making that employer "cease doing business" with a builder who insists on the use of prefabricated materials. But *National Woodwork* teaches that these are permissible ancillary issues and effects. The determination whether a contract clause or union activity is secondary

rests on an analysis which focuses on the union's objective; the question is "whether, under all the surrounding circumstances, the Union's objective was preservation of work for [the unit's] employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere." 386 U.S. at 645, 87 S.Ct. at 1268.[3] In our view, this analysis requires the conclusion that if the union has negotiated a valid work-preservation agreement with its employer and is enforcing that agreement, the union's activity is primary. The union is entitled to enforce its contract with the employer who signed it.

In short, we believe that the "right to control" test must be abandoned. This conclusion has been reached by commentators[4] and by all of our sister

---

3. The Supreme Court's analysis in *National Woodwork* requires the Board to determine what the union's objective was. As the discussion in text demonstrates, that objective may, as a practical matter, include the desire to affect business practices of the union's immediate employer and of other businesses with whom the employer is presently doing business. It may even have the ancillary effect, in a work-preservation dispute, of causing the employer to cease doing business with a supplier who only produces prefabricated material involving work which the union seeks to preserve for its own. These objects and effects are, however, irrelevant to the primary-secondary line drawn by *National Woodwork*. Rather, the objective which must be carefully appraised is whether the unit employees are inducing a boycott in order to protect unit jobs, or whether the *labor relations* object of the boycott lies elsewhere. As Judge Hays wrote for the Second Circuit:

"* * * Those cases [*National Woodwork* and Houston Insulation Contractors Ass'n v. NLRB, 386 U.S. 664, 87 S.Ct. 1278, 18 L.Ed.2d 389 (1967)] hold that where the execution of an agreement between a union and an employer under which the employer *is not to use the products of* another employer is motivated by the desire to preserve work for the employees of the employer making the agreement, the object of the agreement is 'primary' and the agreement is law-

ful. It is only where an agreement not to use the products of another employer is designed to bring pressure on *that* employer with respect to *his* employees that the agreement has a 'secondary' purpose and is proscribed by Section 8(e)."

NLRB v. Local Union No. 28, Sheet metal Workers' Int. Ass'n, 2 Cir., 380 F.2d 827, 830 (1967). (Emphasis in original.)

4. Note, Secondary Boycotts and Work Preservation, 77 Yale L.J. 1401, 1416–1417 (1968):

"The modern primary-secondary analysis requires the complete abandonment of the present 'right of control' rule. The unit has bargained for its rights and signed a contract with its employer, who happens to be a subcontractor. These two are without doubt the primary parties. The general contractor is removed from this direct confrontation, enters into the picture after the agreement has been made, receives his authority over job placement of the complaining unit derivatively * * *, and is fully aware of the consequences of such work-preservation agreements. The effects upon the general contractor [or builder] of any strike in this situation are thus ancillary to a primary dispute with the immediate employer vindicating bargaining unit concerns. * * *

"This reasoning, furthermore, requires no special hardships: the gen-

circuits[5] that have had occasion to pass on the question since the *National Woodwork* case.

### III

Since the Board employed the wrong legal test to assess the union's conduct, this case must be remanded to the Board. Since the Board explicitly declined to pass on the question whether the work-preservation clause in the present case covered work fairly claimable by the relevant unit,[6] on remand the Board should determine that issue.

The union's petition to review is granted, and the Board's finding of an unfair labor practice in this case is set aside. The Board's cross-petition for enforcement is denied.

Remanded for further proceedings consistent with this opinion.

eral contractor [or builder] has adequate notice; machinery exists to mediate any dispute over work between subcontracting units; and the subcontractor is merely estopped from assigning to another party the rights he guaranteed to his own employees."

5. American Boiler Manufacturers Ass'n v. NLRB, 8 Cir., 404 F.2d 556, 560–561 (1968) ; NLRB v. Local Union No. 164, Int. Brotherhood of Electrical Workers, 3 Cir., 388 F.2d 105, 109 (1968). *See* Beacon Castle Square Building Corp. v. NLRB, 1 Cir., 406 F.2d 188, 192 n. 10 (1969). *See also* Danielson v. Painters District Council No. 20, etc., S.D.N.Y.,

305 F.Supp. 1108, 1113–1117 (1969) ; Rotenberg v. Plumbers Union Local 15, United Ass'n etc., D.Minn., 304 F.Supp. 880 (1969).

6. Meat & Highway Drivers, Dockmen, etc., Local 710 v. NLRB, 118 U.S.App.D.C. 287, 335 F.2d 709 (1964) ; Truck Drivers Union Local No. 413 v. NLRB, 118 U.S. App.D.C. 149, 334 F.2d 539, cert. denied, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964) ; Orange Belt District Council of Painters No. 48 v. NLRB, 117 U.S. App.D.C. 233, 328 F.2d 534 (1964). *See also* Lewis v. NLRB, 122 U.S.App.D.C. 18, 350 F.2d 801 (1964).