**BEACON CASTLE SQUARE BUILDING CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 7150.

United States Court of Appeals
First Circuit.

Jan. 24, 1969.

Edwin Sidman, Boston, Mass., with whom Howard Rubin and Guterman, Horvitz & Rubin, Boston, Mass., were on brief, for petitioner.

Warren M. Davison, Attorney, Washingon, D. C., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Ian D. Lanoff, Attorney, Washington, D. C., were on brief, for respondent.

Frederick W. Roche, Burton Peltz, and Roche, Carens & DeGiacomo, Boston,

Mass., on brief for Associated General Contractors of Massachusetts, amicus curiae.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

Beacon Castle Square Building Corporation (Beacon) petitions for review of an order of the National Labor Relations Board dismissing a complaint against the respondent union (Local 537).[1] The General Counsel issued a complaint charging Local 537 with violation of the secondary boycott provisions of the Act, § 8(b) (4) (i) and (ii) (B), alleging that this union directed its members to strike a subcontractor in order to force it to cease doing business with the general contractor.

Beacon, a general contractor engaged to build four "high rise" apartment buildings in Boston,[2] subcontracted the plumbing and heating work to the Frank Sullivan Company. On this project Sullivan employed plumbers from Local 12 and pipefitters from Local 537.[3] Sullivan was a party to a collective bargaining agreement with Local 537 which provides in part as follows:

### ARTICLE VI

#### Temporary Heat

"1. Pipe fitters shall have jurisdiction over the operation and/or emergency maintenance of all temporary heat work whenever temporary heat is on a building, [sic] structure, or addition thereto, regardless of the source of heat supply.

\*   \*   \*   \*   \*   \*

6. It shall be the duty of Job Stewards to report to the Secretary of Local 537 all jobs on which it appears temporary heating will be required.

\*   \*   \*   \*   \*   \*

9. Any use of the heating system prior to its completion shall be considered temporary operation, until its formal acceptance by the owner." [4]

In January 1967 the project, and Building 23 in particular, neared completion. The Sullivan Company installed a temporary heating system to facilitate the work of the craftsmen but rather than using Local 537 (pipefitters) in accordance with the contract, it assigned this work to Local 12 (plumbers). When the work on the central heating unit of Building 23 was substantially complete, Beacon's project manager, one Davis, notified the Sullivan Company and the owner's architects that he wanted an inspection of the heating system with a view to acceptance by the owner on January 30. In preparation for this Sullivan inspected the system on January 26 and 27 and had it running on the 30th.

During the afternoon of the 30th Russell Campbell, the business agent for Local 537, came to the boiler room of Building 23 where those concerned with the inspection were gathering. Present were Edward Segal, Beacon's job superintendent, John T. Sullivan, son of the president of the Sullivan Company, and Paul Richard, Sullivan's pipefitter foreman, who was also a member of Local 537. When he arrived, Campbell asked where the temporary firemen were. Segal answered that since the heating system was substantially complete and was about to be accepted by the owner, there was no need of temporary firemen. Campbell remarked that the system was not complete and could not be accepted until it was 100 per cent complete. He then instructed Richard to drain the water from the hot water heating system and to have his men report at the union office the next morning rather than on the job. Richard did not, however, draw the heating system down and later the

---

1. Local Union No. 537, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO.

2. Designated by the parties as Buildings 20, 21, 22 and 23.

3. These were sister locals.

4. It appears that the purpose of these provisions was to provide work for elderly or sickly union members.

same day the owner formally accepted the system.

On February 1, with the strike now in progress, Campbell met with Beacon project manager Davis and John Sullivan. Davis stated that the contract permitted acceptance whenever the heating system was "sufficiently complete and operating automatically," and that it had in fact been accepted. Campbell refused to consider this, now taking the position that the Sullivan Company's contract to install heating systems in four buildings was a single undertaking and that the acceptance in regard to Building 23 was an impermissible partial acceptance.

On February 3 there was another meeting at which Campbell, Smith, the union's International Organizer, and Francis Sullivan were present. At this meeting Francis Sullivan informed Campbell for the first time that Local 12 plumbers had been employed to provide the temporary heat in Building 23. When Campbell confirmed this information, realized that the work remaining on the heating system in this building was very minor and that the tenants had been advised that they could move in, he relented and stated he would get the men back on the job the following Monday morning.

The issue is whether Local 537 was really striking against Sullivan or whether Sullivan was a neutral in a dispute that actually was between Local 537 and the general contractor. This issue can be resolved by a consideration of two questions: (1) What was the union striking for? (2) Was Sullivan in a position to do anything about it?

The answer to the first question is complicated by the fact that Campbell espoused two different theories which he blandly mixed together. At one point he said that the condition of Building 23 was irrelevant, that the whole job must be considered as one for purposes of acceptance.[5] In the next breath he said that the buildings could be accepted one at a time and that temporary firemen were required only until the particular building was accepted.[6] Then later, exasperatingly, he went back to his orig-

---

5. "[W]hat I did say was that when the Frank Sullivan Company as a competitive bidder for the heating on this particular project he didn't bid for building number twenty and then put in a separate bid for twenty-one he bid this job as four buildings, * * * and when they accept the project they would accept the job in its entirety."

Trial Examiner: "All four buildings in other words?"

The witness: "The project, not this building here, they wouldn't accept nine floors and not the rest."

Trial Examiner: "It is your contention then what you said to Mr. Davis was the fact that the system had not been accepted in full by the owner until all of the buildings, the entire contract was accepted, is that right?"

The witness: "That is what I told Mr. Davis."

6. "Q. (By Mr. Dwyer) Was not the thrust of your demand, Mr. Campbell, which you made to Mr. Davis that Local 537 firemen should be employed to operate the heating system in building twenty-three until the heating system in building twenty, twenty-one, twenty-two and twenty-three were all completed, is that not a fact?

A. No, I believe the way the conversation went was when that building twenty-three or whatever it is was completed to the satisfaction of the heating contractor and the owner, the owner would send a letter, and this is the practice in our area, the owner would give a letter of formal acceptance which would start the day of the warranty for that heating contractor on that date. I said to Mr. Davis, I believe, 'start the man in building twenty-three and he might only be there a couple of weeks when the people move in, the job is accepted and is satisfactory to the Sullivan Company and we will move the same man into the building twenty-four.'

"All right. Now, is it a fact that you refer to the project not being completed and when you said that you meant that the project was all four buildings, isn't that a fact?

"A. The heating system was in all four buildings as I said when the job was bid he didn't bid for individual buildings, it was the whole project, the heating system.

"Q. So isn't it also a fact that when you informed Mr. Davis that a temporary fireman would have to be put on building twenty-three that that would—

inal theory.[7] Nor does a reading of the testimony of the other parties to the dispute provide much illumination.[8]

The trial examiner, considering this farrago of information, concluded that Campbell "clearly regarded the heating systems in Building 23 and the other three buildings of the project as incomplete both individually and collectively, and as thus requiring Sullivan to hire pipefitter temporary firemen." In our opinion there is substantial evidence in the record to support this finding as an overall interpretation and assessment.

The second question to be considered is whether the Sullivan Company could have done anything about Campbell's demands at that point, i. e., whether the company had the right to control in these circumstances. See Local No. 5, United Association of Journeymen and Apprentices of Plumbing and Pipe Fitting Industry of United States & Canada v. N.L.R.B. (Venneri), 321 F.2d 366 (D. C. Cir.), enforcing 137 N.L.R.B. 828, cert. denied, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963). We do not think that the Sullivan Company was powerless to act in this situation. It could have put firemen on in Building 23 for what-

ever time, long or short, they should have remained thereafter.[9] Further, the Sullivan Company could have assured Campbell that firemen would be assigned promptly to the other buildings when they reached the appropriate stages of ·completion. Had this been done, Campbell would have been forced to state clearly that one building could not be accepted apart from the whole project if this was his root position. Petitioner seems to argue that the Sullivan Company was powerless in regard to Building 23 because it was then much too late for temporary firemen and that it was powerless in regard to the other buildings because it was much too early for temporary firemen to be there. We regard this as a wholly false dilemma. Campbell was entitled to pick up the pieces in regard to Building 23 and also to see to it that the violation not be repeated in the other buildings.

Several cases, especially *Venneri*, supra, are called to our attention to support the contention that Local 527 was engaging in secondary activity. We need not consider these cases in detail because they have in common the premise that the employer who was the putative object of

---

that man would remain there until all four buildings were completed, the heating system of the four buildings?

"A. No, that isn't a fact. He wouldn't remain in building twenty-three. Once the tenants had moved in he would go to building twenty-four or twenty-five or twenty-six or whatever the numbers of the buildings were.

"Q. Who maintains the heat once the tenants are moved in, if you know?

"A. There is a formal acceptance by the owners and it would be whoever the owners hired I suppose."

7. "Q. In this same conversation with Mr. Davis do you remember saying to him four buildings make the entire project and the union will only recognize four completed buildings as being the entire project, you remember stating that?

"A. [W]ell, as I started to say when he bid the job with competitive bidders he didn't bid one building by number he bid the whole complex."

8. John Sullivan and Davis seemed to think that the dispute centered around whether Building 23 could be considered separate-

ly. Davis muddies the water further, however, in explaining his view by quoting Campbell to the effect that "[y]ou cannot make a differentiation between tenant space and commercial space." This is actually more in line with Campbell's other theory that the dispute was about whether Building 23 was actually completed. On the other hand, Segal and Francis Sullivan seemed to think that the dispute was simply about the progress that had been made in Building 23. But Francis Sullivan was speaking in a context in which it was already known that Local 12 people had worked as temporary firemen and this may have colored his thinking.

9. This, of course, became moot once the building was actually accepted by the owner. While acceptance in fact took place later on the same day that Campbell made his demand, acquiescence by Sullivan at the time of the demand would not necessarily have been a futile gesture. Inspection by the architect's representative had not yet taken place. Acceptance had to wait upon a satisfactory report.

the strike was actually powerless to settle the disputes.[10]   Because we have already determined that Sullivan was not powerless to settle the dispute, we find those cases inapplicable.

Petition for review will be denied.

10.  Moreover, where the Board is justified in finding that a strike was directed solely at a breach by an employer of a collective bargaining agreement, the latter's power of control is not of decisive significance.  American Boiler Mfgrs. Ass'n v. N.L.R.B., 404 F.2d 547 (8th Cir. 1968) ;  N.L.R.B. v. Local Union No. 164, I.B.E.W., 388 F.2d 105 (3rd Cir. 1968).