WESTERN MONOLITHICS CONCRETE PRODUCTS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 25169.

United States Court of Appeals, Ninth Circuit.

July 21, 1971.

Robert Tollen (argued), San Francisco, Cal., Philip J. Smith, Paul Paduck, of Smith, Paduck, Clancy & Wright, Oakland, Cal., for real party in interest Bricklayers' & Stone Masons' Union, Local No. 8, and others.

Baruch A. Fellner (argued), Glen M. Bendixsen, Attys., Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Arnold Ordman, Gen. Counsel, N. L. R. B., Washington, D. C., Roy O. Hoffman, Director, N. L. R. B., San Francisco, Cal., for respondent.

Chickering & Gregory, San Francisco, Cal., for petitioner.

Before DUNIWAY, WRIGHT and KILKENNY, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

This is a petition to review a decision of the National Labor Relations Board. The petition to review is granted and the order of the Board modified.

## I. THE FACTUAL BACKGROUND.

Petitioner Western Monolithics (doing business as California Concrete Sys-

tems) manufactures prefabricated masonry fireplaces. Its employees are represented by Local 10 of the Bricklayers' and Stone Masons' Union, a sister group to Local 8 of the same union which is here charged with unfair labor practices. California Concrete's prefabricated fireplaces are manufactured at its plant in Milpitas, California, and delivered to the construction site. After installation they are complete except for construction of facings and hearths which is done by bricklayers at the job site.

Besco, a general contractor, builds single family residences in Alameda County. In April, 1968, it was constructing homes at two projects in Alameda County and had determined that in all of its project homes it would utilize prefabricated fireplaces. Its architects drew appropriate plans which specified precast fireplaces, to be supplied by California Concrete.

Though Besco employs several hundred persons who are members of other unions (carpenters, laborers, teamsters, etc.), it employed no bricklayers on these projects. Rather, the masonry work associated with the fireplaces was subcontracted to West Valley Masonry Company ("West Valley") and D. E. Nesbit Masonry Company ("Nesbit").

The Besco housing projects were located within the jurisdiction of Bricklayers' and Stone Masons' Union Local No. 8, Bricklayers, Masons & Plasterers' International Union of America, AFL-CIO ("Local 8"). West Valley and Nesbit maintained their principal places of business in Santa Clara County which is under the jurisdiction of Local 10. As their work for Besco began, they were approached by Sinclair, the Local 8 business agent, who said that a new contract between the union and the masonry contractors in the Greater Bay Area had been agreed upon. Sinclair asked West Valley and Nesbit to sign the new agreement if they intended to do work within the jurisdiction of Local 8.

Both West Valley and Nesbit signed the "new agreement." Article XV con-

tained a work preservation agreement which stated that construction of fireplaces was unit work, traditionally performed at the job site. Accordingly, the agreement provided that the union would "refuse to permit bricklayers employed by the employer to handle prefabricated fireplaces" unless they were fabricated at the job site or "in the shop of an employer within the bargaining unit who is bound by this agreement." Though union made, the California Concrete fireplaces were not constructed in the shop of a Local 8 employer and thus were subject to the work preservation aspect of this agreement.

Sinclair visited the Besco projects on several occasions to check the work done by West Valley and Nesbit. After several exchanges, Sinclair instituted charges against union members who were employees of West Valley and Nesbit for "installing faces on concrete prefabricated fireplaces, after being told not to do so by the Union." The individual employees were each fined $500 by the trial board of Local 8.

During the course of Sinclair's efforts to stop work on the fireplaces he met with the Besco tract superintendent. At this meeting, Sinclair indicated that further work would be a good way to initiate a picket line and that, if Besco did not see that work on the prefabricated fireplaces came to a halt, Sinclair would shut down the entire project by picketing Besco.

## II. THE DECISION OF THE BOARD.

The foregoing circumstances resulted in filing of charges of unfair labor practices against Local 8 by California Concrete. Specifically, Local 8 was charged with violating the provisions of Section 8(b) (4) (i) and (ii) (B)[1] in that its actions against West Valley, Nesbit and Besco amounted to a secondary boycott.

The National Labor Relations Board found that Local 8 had committed unfair labor practices by fining the employees of West Valley and Nesbit.[2] The union has not contested that aspect of the Board's decision and the propriety of that finding is not before us.

The Board refused, however, to find that the union had committed an unfair labor practice when it threatened to picket the general contractor, Besco.[3] It is this aspect of the Board's decision that California Concrete contests and presents to this court for review. We agree with California Concrete and find that the Board erred when it concluded that Local 8's threat to picket Besco was not an unfair labor practice.

Our approach to resolution of this question begins with National Wood-

1. 29 U.S.C. § 158 provides, in pertinent part:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \*

(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \*

(B) forcing or requiring any person to cease using, selling, handling, trans-

porting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing. \* \* \* "

2. Bricklayers' and Stone Masons' Union Local No. 8 (California Concrete Systems), 180 N.L.R.B. No. 3, 72 L.R.R.M. 1612 (1969).

3. *Id.*

work Manufacturer's Assn. v. N. L. R. B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed. 2d 357 (1967), in which the Court sanctioned the use of work preservation agreements like that involved here and held that such agreements, under appropriate circumstances, did not amount to "hot cargo" agreements proscribed by Section 8(e)[4] of the National Labor Relations Act. While approving appropriate work preservation agreements as lawful primary objects of collective bargaining, the Court did not pass on the Board's "right to control" theory which is extensively involved in this controversy as regards the proper party for union activity in furtherance of its work preservation agreement. National Woodwork Mfgers. Assn. v. N. L. R. B., *supra*, at 616, n. 3, 87 S.Ct. 1250.

Applying its "right to control" test in this case, the Board concluded that the union had committed an unfair labor practice when it coerced the employees of the masonry subcontractors to cease doing business with Besco. The classic definition of "right to control" is found in Judge Prettyman's opinion in Ohio Valley Carpenters District Council, U. B. of C. v. N. L. R. B., 339 F.2d 142 (6th Cir. 1964):

> "The basic criterion is, as the statute (Section 8(b) (4)) specifically provides, the object, or objects, of the union action. So the problem is: What was the object? The Board has held

several times that, if a union demands that a contractor do something that he is powerless to do except by ceasing to do business with somebody not involved in the dispute, it is manifest that an object of the union is to induce this cessation of business. * * * *" *Id.* at 145.

Stated otherwise, the Board's test requires a determination of whether the party to whom the union protests has the power to change conditions so as to satisfy the union's demands. As applied here, the Board found that West Valley and Nesbit lacked the requisite right to control since they were powerless to substitute hand built fireplaces for the prefabricated ones specified by Besco in its agreements with these masonry subcontractors.

Applying this test to the threatened picketing of Besco, the Board found that the union had a right to coerce Besco to stop doing business with California Concrete because its primary objective was work preservation and because Besco had the right to control the type of fireplaces to be installed. This finding was made despite the fact that Besco had no collective bargaining agreement with Local 8 and employed no members of Local 8 or any other bricklayers or employees who might qualify for membership in Local 8.

The anomalous result of applying the Board's test to this case is that the un-

---

4. "It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or

other work: *Provided further*, That for the purposes of this subsection and subsection (b) (4) (B) of this section the term 'any employer,' 'any person engaged in commerce or an industry affecting commerce', and 'any person' when used in relation to the terms 'any other producer, processor, or manufacturer', 'any other employer', or 'any other person' shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further*, That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception." 29 U.S.C. § 158(e).

ion cannot picket West Valley or Nesbit under which case the common situs picketing would be governed by the standards of Moore Dry Dock Co., 92 N. L. R. B. 547. Instead, the Board ruled that the union may picket the general contractor Besco and shut down the entire project to enforce its demand regarding a limited aspect of the job.

■ We are thus compelled to conclude, as have the commentators[5] and at least four[6] of our sister circuits, that the Board's singular reliance upon right to control is improper and should be abandoned. In *National Woodwork*, the Court re-emphasized the need to analyze these situations to determine whether the activity complained of is primary (and therefore permissible) or secondary (and an unfair labor practice). "The determination * * * cannot be made without an inquiry into whether, under all surrounding circumstances, the Union's objective was preservation of work * * * or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere." *National Woodwork, supra,* 386 U.S. at 644, 87 S.Ct. at 1268. Thus, while right to control is one of the "surrounding circumstances" it cannot be the sole determinative factor in a controversy of this type.[7]

The Board points out that it has consistently regarded right to control as the important factor in making the necessary primary-secondary distinction, citing its decision in Local 636, Plumbers, etc. (Mechanical Contractors Assn. of Detroit), 177 N. L. R. B. No. 14 (1969). There, as here, the Board relied exclusively upon right to control in determin-

ing that the union could not enforce its work preservation agreements by coercive action against subcontractors who were contractually bound to install pre-piped boilers contrary to their work preservation agreement with the union.

That decision has since been reviewed and the Board's finding set aside. Local Union No. 636 v. N. L. R. B., 139 U.S. App.D.C. 165, 430 F.2d 906 (1970).

In denying enforcement and setting aside the Board's order, the D. C. Circuit added its voice to the unanimous reactions of the other circuits which have reviewed the Board's position regarding right to control. What was said there is particularly appropriate in this setting:

"No claim has ever been made that Local 636 has any interest at all in the labor relations of Holy Cross Hospital, the usual type of 'secondary' object. If the union had any objective with regard to the hospital, it was to convince the hospital not to use pre-piped units. But focusing on this aspect of the case makes for faulty analysis: the whole point of the work-preservation agreement in this case, as in *National Woodwork*, was to convince builders generally not to use prefabricated materials. Work preservation clauses, of necessity, will have effect by a domino-like process: the union negotiates the restriction with its employer—the contractor. The contractor, bound by his collective bargaining agreement, will not contract with a builder who seeks to use prefabricated materials. The builder may then accede to the demand that the work be done at the job site, or he may seek another contractor not bound by such

5. *See* Note, Secondary Boycotts and Work Preservation, 77 Yale L.J. 1401 (1968). *See also* Note, Work Preservation and the Secondary Boycott—An Examination of the Decisional Law Since National Woodwork, 21 Syracuse L.Rev. 907 (1970).

6. Local U. No. 636 v. N.L.R.B., 139 U.S. App.D.C. 165, 430 F.2d 906 (1970); Beacon Castle Square Bldg. Corp. v. N.L.R.B., 406 F.2d 188, 192 n. 10 (1st Cir. 1969) (dicta); American Boiler Mfgers. Ass'n v. N.L.R.B., 404 F.2d

556 (8th Cir. 1968); N.L.R.B. v. Local Union No. 164, I.B.E.W., 388 F.2d 105 (3rd Cir. 1968). *See also* Danielson v. Painters District Council No. 20, 305 F. Supp. 1108 (S.D.N.Y.1969); Rotenberg v. Plumbers Union Local 15, 304 F.Supp. 880 (D.Minn.1969).

7. Local U. No. 636 v. N.L.R.B., *supra,* at 910; American Boiler Mfgers. Ass'n v. N.L.R.B., *supra,* at 561–562; N.L.R.B. v. Local U. No. 164, I.B.E.W., *supra,* at 109.

a restrictive union contract." *Id.* at 909–10.

The finding of the Board here that Besco was susceptible to coercive action by the union because of its right to control removed the important alternative set forth above. So long as the union is free to view Besco as the target of its activity, Besco cannot "seek another contractor not bound by such a restrictive union contract." The union's complaint here was clearly with West Valley and Nesbit who agreed to the work preservation clause. Its attempts to force them to stop doing business with Besco were lawful primary activity aimed at work preservation. However, when it expanded its attack to a threat to Besco it extended the controversy to a protected neutral who had the right to determine its relationship with West Valley and Nesbit and seek other subcontractors who were not bound by the restrictive work preservation clause.

The Board's opinion sought to bolster the finding that the union had a right to take coercive action against Besco by reference to an agreement between Besco and the Building and Construction Trades Council of Alameda County of which Local 8 is a member. That agreement was executed in 1965, nearly three years before the adoption of the work preservation agreement involved herein. It provided that the employer (Besco) agreed *inter alia* to "comply with the hours of labor and other conditions of employment on the work at said job site provided by agreements covering such work in effect between any Labor Organization referred to in Section 2 hereof with other Employers in the area."

It is argued that this agreement binds Besco to adhere to existing work preservation agreements and that its failure to do so here by selecting prefabricated fireplaces left it open to coercive union action. Whatever may be the purpose and effect of this agreement, it cannot change the character of the parties in this dispute.[8] The union's complaint here is with the parties who are signatory to the work preservation agreement. Besco is neutral and therefore any action against it remains secondary. The building trades agreement cannot change the basic nature of the dispute or the parties in this controversy.

The petition for review is granted and the order of the Board set aside to the extent that it holds that Local 8 did not commit an unfair labor practice when it threatened to picket Besco. The remainder of the Board's findings are not on review and therefore remain undisturbed.

---

8. *Cf.* N.L.R.B. v. Southern Cal.Dist. Council of Laborers, 443 F.2d 220 (9th Cir. 1971).