The CHAMBER OF COMMERCE OF the UNITED STATES of America for and on Behalf of its member BOISE CASCADE CORPORATION, Petitioners-Appellants,

v.

The NATIONAL LABOR RELATIONS BOARD, Respondent-Appellees.

SUMMIT VALLEY INDUSTRIES, INC., Petitioner,

v.

The NATIONAL LABOR RELATIONS BOARD, Respondent.

UNITED BROTHERHOOD of CARPENTERS & JOINERS of AMERICA, LOCAL UNION # 112, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

Chamber of Commerce of the United States of America, Intervenor.

Nos. 75–2064, 75–2166 and 75–2770.

United States Court of Appeals, Ninth Circuit.

March 8, 1978.

Rehearing and Rehearing En Banc Denied in Nos. 75–2064 and 75–2770 May 4, 1978.

Donald C. Robinson, Butte, Mont., for appellants-petitioners.

Elliott Moore, Washington, D.C., for N.L.R.B.

Paul T. Bailey of Bailey, Doblie & Brunn, Portland, Gerard C. Smetana, of Borovsky, Smetana, Ehrlich & Kronenberg, Washington, D.C., for intervenors.

Kenneth C. McGuiness, of Washington, D.C., for amici curiae.

Before MERRILL and TRASK, Circuit Judges, and TAKASUGI,* District Judge.

* Honorable Robert M. Takasugi, United States District Judge, Central District of California, sitting by designation.

TRASK, Circuit Judge:

This case arises out of the continuing battle by labor unions against prefabricated building materials that limit on-site construction work.[1]

The National Labor Relations Board found that the United Brotherhood of Carpenters and Joiners of America, Local No. 112 (the Union) violated Section 8(b)(4)(B) and 8(b)(4)(D) [2] of the National Labor Relations Act [3] in its activities attempting to enforce a work preservation clause.

The matter comes to this court on a petition by the Chamber of Commerce of the United States of America (the Chamber), for and on behalf of its member Boise Cascade Corp. (Boise Cascade), a petition by Summit Valley Industries, Inc. (Summit), and a petition by the Union. The Board is seeking enforcement of its order. The court ordered consolidation of these matters.

**1.** See Leslie, *Right to Control: A Study in Secondary Boycotts and Labor Antitrust*, 89 Harv. L.Rev. 904 (1976).

**2.** 29 U.S.C. § 158(b)(4)(B) and § 158(b)(4)(D).

**3.** 29 U.S.C. § 151 *et seq.* (the Act).

**4.**
ARTICLE XXII
Contracting or Sub-Contracting
or Work to be Done at the
Site of Construction

SECTION 1. Application. The Employers are in the construction industry and both parties have elected to come under the proviso applicable to the construction industry contained in Title 29, Section 158(e) of the United States Code as amended.

SECTION 2. Scope of the Foregoing. Sections 1 and 3 of this Article relates to contracting or sub-contracting and work to be done at the site of the construction, alteration or repair of a building structure or other work.

SECTION 3. (A) All of the following work shall be performed at the site of construction, alteration or repairing of a building structure or other work and shall not be subcontracted off the jobsite, unless said work is done at the Employer's shop.
(1) All the erection of the forms for basements and/or footings for the structures. Nothing herein shall be construed to apply to prebuilt forms which have, through past practice, been utilized by the Employers.
(2) The installation of all exterior siding or finishing, or, in the alternative, all wallboards and/or paneling.

I.

Many years of peaceful collective bargaining agreements between the Union and the Silver Bow Employers Association in Butte, Montana, were disrupted in 1969 by the introduction of modular houses into the building construction market.

These modular houses were viewed with alarm by the Union and the local Building Trades Council because their use potentially reduced the amount of carpentry work needed at new home sites. When negotiations for a new collective bargaining agreement commenced in 1971 between the Union and Silver Bow Employers Association, the Union demanded a broad work preservation clause. No agreement could be reached initially and a three-month strike ensued. A limited work preservation clause, Article XXII, was eventually agreed upon,[4] bringing the strike to an end.

(3) The installation of all exterior trim on the structure, or in the alternative, all interior trim on the structure.
(4) The installation of all interior doors on the structure.
(5) The shingling of all roofs, whether wood, metal, or composition material.
(6) Installation of all cabinets and shelving.
(7) The cutting and installation of all wooden stairs and/or bannisters.
(8) The installation of all form work for steps and/or stoops. . . .
(9) The placing and fastening of all components of the structure upon the foundation.
(B) Nothing herein shall apply to any structures in the following situations:
(1) (Omitted).
(2) When the construction work done by the Employer at the site of a pre-assembled or pre-built single family dwelling unit consists of building independent structures such as garages or other structures that are not part of the unit itself.
(C) No Employer shall be discriminated against, nor be adversely affected by the Union, for accepting and completing any subcontracted work that conforms to Paragraph A of this Article.
(D) Nothing herein shall be construed to restrict work by carpenters or contractors when pre-fabricated or pre-built components of construction not listed in Paragraph A are utilized, installed or assembled at the site of construction.

Subsequently, Silver Bow Employers Association filed charges that Article XXII violated Section 8(e) and that the Union violated Section 8(b)(4)(A) by striking to obtain it. The Board rejected these arguments, finding that Article XXII was a valid work preservation clause. *United Brotherhood of Carpenters, Local # 112 (Silver Bow Employers Assn.)*, 200 NLRB 205 (1972).

After the validity of the clause had been established, the Union attempted to enforce the clause. It is the method of enforcement and the parties at whom the enforcement was directed that create the basic issues here.

A Butte contractor, Jovick Construction Co., a signatory of the Union agreement, contracted to build a house foundation and garage. These were for a Summit modular house. The Union's business agent, Cadigan, went to the site and ordered a worker off the job because the work was for a modular house. Jovick, a member of the Union, continued to work on the house. The Union brought charges against him, suggesting the maximum penalty.

Cadigan similarly approached Union members working for Perusich Construction, ordering them not to work on a Boise Cascade modular house.

Lutey Construction Co., another Butte contractor, was working on foundations for a Boise Cascade homesite. Lutey had been hired by Jack McLeod & Associates (McLeod), the Boise Cascade home franchise dealer in Butte. Cadigan ordered William Lutey, a carpenter employee, off the job, telling him Union members were not to work on modular houses. Lutey then left the job.

Other incidents involved Union pressure against parties who were not signatories to the collective bargaining agreement. Boise Cascade had contracted with Reed Lemmons, a house mover, to deliver houses to the Butte area. Cadigan visited a site where Lemmons and his crew were placing a house on its foundation. Cadigan was told that Lemmons' employees were not unionized. Cadigan threatened to picket the site if they did not leave, because he said placing the houses on the foundations was work belonging to the carpenters' union.

Cadigan also confronted McLeod about the placing of modular houses on foundations. Cadigan made it clear to McLeod that (1) placing the houses on foundations was work belonging to the carpenters, (2) that no houses were to come into Butte unless partially finished as provided in Article XXII, and (3) that if McLeod was becoming a contractor, he would have to sign the Union contract or the Union would move to bar Boise Cascade houses from Butte.

Boise Cascade sent two employees, Garry and Pratt, to Butte from Pocatello, Idaho, to finish a Boise Cascade modular house. The two were members of the carpenters' local in Pocatello. Before starting work, they went to Cadigan to secure a clearance to work in the Union's jurisdiction. Cadigan refused to allow Garry and Pratt to work on the Boise Cascade house because Boise Cascade was not a signatory to the Union's agreement. Cadigan also threatened to picket if the men did start to work. The men then informed McLeod, the Boise Cascade franchise dealer, that they would not be allowed to work and returned to Pocatello.

Summit had a contract with its employees through the International Brotherhood of Teamsters, Local No. 2, Butte, Montana (Teamsters). After the Union pressured Jovick away from finishing Summit houses, Summit's employees began to do the finishing work. As a result, the Union started to picket a Summit model home informing passers-by that carpenters had not been employed in constructing the building.[5]

5. The picket's sign read:

NOTICE
TO THE PUBLIC
THIS EMPLOYER DID NOT
EMPLOY MEMBERS OF
CARPENTERS UNION IN THE
WORK PERFORMED ON THIS
BUILDING. LOCAL 112
CARPENTERS UNION
AFL–CIO

Thereafter, Summit filed charges with the Board alleging that the Union was violating Section 8(b)(4)(D) by attempting to force Summit to reassign modular home work from the Teamsters to the Union. Pursuant to Section 10(k), the Board made a work jurisdiction dispute determination against the Union.[6]

As a result of that award to the Teamsters, the Union advised the Board that it would not require Summit to assign work in violation of its Teamsters contract, but added:

> That the Union affirms that it has the right, and will under some circumstances use its rights under the National Labor Relations Act, to truthfully advise the public, whether by picketing or other publicity that the Summit Valley Industries, Inc., does not employ members of, or have a contract with the United Brotherhood of Carpenters & Joiners of America, Local 112, AFL–CIO, if, in fact, such is the truth and such picketing or publicity is for the sole purpose of advising the public of the situation.

The Board found that these actions of the Union violated Section 8(b)(4)(B) and 8(b)(4)(D) of the Act. Specifically, it was found that the Union violated Sections 8(b)(4)(i) and (ii)(B) when it instructed employees of Jovick, Perusich and Lutey to leave their jobsites. This constituted inducement to refuse to perform services with the object of exerting pressure against the modular house manufacturers. The Board further found that the Union violated Section 8(b)(4)(i) and (ii)(B) by encouraging or inducing Garry and Pratt, and Summit employees to cease working on modular houses and by threatening Lemmons, McLeod, Boise Cascade and Summit in order to cause the manufacturers to conform to Article XXII or cease bringing modular houses into Butte. In addition, the Board determined that the Union violated Section 8(b)(4)(D) by failing to comply with the Board's Section 10(k) award by refusing to unequivocally waive picketing to effect reassignment of Summit factory and jobsite work from Teamster-represented employees.

The Board ordered the Union to cease and desist the unfair methods of enforcing Article XXII. It was also ordered to comply with the Board's Section 10(k) work award. In addition, the Union was required to rescind all disciplinary actions, return fines and reinstate members where the Union members were penalized for working in violation of Article XXII.[7]

II.

The first issue that needs to be addressed involves the validity of Article XXII. The Chamber of Commerce, in its brief, argues that the Union sought Article XXII for an improper purpose violating Section 8(e).[8]

Section 8(e) makes it an unfair labor practice for unions and employers to enter into contracts whereby the employer ceases or agrees to cease doing business with any other person. But, under *National Woodwork Manufacturers Association v. National Labor Relations Board*, 386 U.S. 612, 635, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967) (*National Woodwork*), section 8(e) does not prohibit agreements made for primary purposes. This includes the purpose of preserving work traditionally done by the union.

The Board here found no Section 8(e) violation. Such a clause can be valid despite the fact some of the union's enforcement attempts violate Section 8(b)(4)(B). *National Woodwork, supra.* Article XXII was also adjudged a valid work preservation clause in *United Brotherhood of Carpenters, Local No. 112*, 200 NLRB 205 (1972). And, the Chamber conceded that on its face, Article XXII was lawful.

---

**6.** *United Brotherhood of Carpenters, etc. (Summit Valley Industries, Inc.)*, 202 NLRB 974 (1973).

**7.** The Board's decision is reported at 217 NLRB 902 (1975).

**8.** 29 U.S.C. § 158(e).

■ The Chamber argues though that the improper enforcement practices that followed prove that from its inception, Article XXII had an unlawful secondary purpose. Such an argument is foreclosed by the *National Woodwork* decision. In that case, the union tried to enforce a work preservation clause against three subcontractors who were not in a position to assign the work and one contractor who could. The enforcement attempts against the three subcontractors were found to be improper secondary activity. But, the enforcement against the general contractor, who had control over the work covered by the work preservation clause, was proper. This shows that just because the union miscalculates the circumstances under which it can act to enforce the clause, it does not render the clause invalid.

■ The Board's findings are supported by sufficient evidence that in contracting for the clause, the Union's purpose was to preserve work traditionally done by the Union. This being a proper primary purpose, Article XXII does not violate Section 8(e).

### III.

Determination of whether the Union violated Section 8(b)(4)(B) and (D) of the Act is controlled by *National Labor Relations Board v. Enterprise Association of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Machine & General Pipefitters of New York and Vicinity, Local Union No. 638*, 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977) (*Pipefitters*). That case reaffirmed the Board's use of the right-to-control test in disputes over enforcement of work preservation clauses. The right-to-control doctrine was used by the Board here and was an issue on appeal.

■ Simply stated, the right-to-control test says that a union violates Section 8(b)(4)(B) when it coerces an employer to assign work to the union when that employer has no control over the work. As pointed out by the Court in *Pipefitters*, 429 U.S. at 523, n. 11, 97 S.Ct. 891, the right-to-control test is not a *per se* test and other surrounding circumstances are taken into consideration. *See, e. g., Local Union No. 438, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO v. National Labor Relations Board*, 201 NLRB 59 (1973), enfd. sub nom., *George Koch Sons, Inc. v. National Labor Relations Board*, 490 F.2d 323 (4th Cir. 1974).

■ Under this test, the violations of Section 8(b)(4)(B) seem clear. Section 8(b)(4)(i)(B) makes it unlawful for a union to "induce or encourage any individual employed by any person" where "an object" of that conduct is to cause an unlawful secondary boycott of another person. Similarly, Section 8(b)(4)(ii)(B) forbids a union from threatening, coercing or restraining any person for a secondary objective.

This improper coercion and inducement is found in the Union's orders for Jovick, Perusich and Lutey to stop work on modular homes and homesites. These parties were subcontractors on projects under which they had no control over the work assigned. This point, plus the other circumstances involved, justified the Board's decision that the Union's conduct was seeking to improperly pressure Summit and Boise Cascade. This would be improper secondary conduct.

Union pressure on Boise Cascade's subcontractor Reed Lemmons and franchiser McLeod also was seen by the Board to have an improper secondary motive, violating Section 8(b)(4)(ii)(B).

Since the Board used the proper test as originally stated in *National Woodwork, supra*, and reaffirmed in *Pipefitters, supra*, the order of the Board as to these violations will be affirmed.[9]

---

**9.** The Ninth Circuit has endorsed the use of right-to-control as part of the Board's analysis in this type of case. *Associated General Contractors of California v. NLRB*, 514 F.2d 433 (9th Cir. 1975). That decision is cited with approval by the Supreme Court in *Pipefitters*, 429 U.S. at 527 n. 15, 97 S.Ct. 891. To the extent *Western Monolithics Concrete Products v. NLRB*, 446 F.2d 522 (9th Cir. 1971) is inconsistent, it cannot stand; particularly after resolution of the conflicts among the circuits in *Pipefitters*.

## IV.

■ Section 8(b)(4)(D) forbids a union from inducing or encouraging anyone to strike in order to force any employer "to assign particular work to employees in a particular labor organization . . . rather than to employees in another labor organization . . .." Unlike Section 8(b)(4)(B), this section applies to both primary and secondary conduct. *Local 450, International Union of Operating Engineers, AFL–CIO v. Elliott*, 256 F.2d 630, 635 (5th Cir. 1958).

The Union in this case ordered its members to stop doing work on Summit houses until Summit, which had not signed the Union agreement, complied with Article XXII. In addition, the Union placed a picket at the site of a Summit model home. Summit already had an agreement with the Teamsters for in-plant work and site work on its houses. To comply with the Union's demands, Summit would have had to reassign a considerable amount of work to the Union.

To resolve this conflict, the Board entered a Section 10(k) award giving the work to the Teamsters. But, after the award, the Union threatened to continue picketing the site to enforce the claim rejected in the Section 10(k) award. In its initial acts against Summit and its further threats against the manufacturers, the Union clearly violated Section 8(b)(4)(D) as found by the Board.

## V.

During the Union action against the influx of modular houses, the Union requested the help of the Southwest Building Trades Council of Montana. This Council is composed of about 15 unions directly engaged in the construction industry.

One of the concerns expressed by the Council was the problem of Teamsters doing intra-jobsite driving. This driving traditionally goes to the craft unions working full-time at the site.

In response, the Council prepared the following letter:

NOTICE TO ALL CONTRACTORS:

Please be informed the Southwest Building Trades Council has taken action that its membership will not work on construction projects with personnel whose International Union is not affiliated both locally and internationally with Building Trades Council, AFL–CIO.

This action pertains to onsite construction and will be in effect commencing October 16, 1972.

On the attached sheet are the unions who are affiliated both nationally and locally with the Building and Construction Trades Department, AFL–CIO.

The Teamsters were absent from the list of affiliated unions.

The letter went to four general contractors not engaged in residential construction.

As a result of the letter, the Chamber filed Section 8(b)(4)(B) charges against the Council.

The Board agreed with the Administrative Law Judge's ruling that since the letter went to no one involved directly in the modular house dispute, there was no improper pressure being placed on the contractors.

■ The issue on appeal where the Board finds that conduct does not violate the Act is whether the Board had a rational basis for its decision. *International Ladies' Garment Workers v. National Labor Relations Board (McLaughlin Mfg. Corp.)*, 150 U.S. App.D.C. 71, 83, 463 F.2d 907, 919 (1972). It is well settled that a reviewing court should not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *National Labor Relations Board v. Holly Bra of California*, 405 F.2d 870, 872 (9th Cir. 1969).

From the context in which the letter arose and the contractors to whom it was sent, it cannot be said that the Board had no rational basis to support its conclusion that all petitions for review should be denied, and the Board's order should be affirmed and enforced. It is so ORDERED.